IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE CHELSEA CONDOMINIUM UNIT OWNERS ASSOCIATION, et al.<br><br>　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>1815 A ST, CONDOMINIUM GROUP, LLC, et al.,<br><br>　　　　　　Defendants. | Civil Action No. 1:06-CV-00187-RMU |

## FIRST AMENDED COMPLAINT

Plaintiffs, The Chelsea Condominium Unit Owners Association ("Owners Association"), and Nicole DeGraffenreed, Shikha Bhatnagar and Joellynn Schulz (collectively, "Unit Owner Plaintiffs"), for their first amended complaint against defendants 1815 A St, Condominium Group, LLC ("Condominium Group"), Herbert A. Callihan ("Callihan"), John F. Casey ("Casey"), and National Title Services, Ltd. ("National Title Services") allege as follows:

## FACTS COMMON TO ALL COUNTS

1.　　　　This case relates to a condominium located at 1815 A Street, S.E., in the District of Columbia, known as The Chelsea, and to the construction, marketing and sale of units at that condominium.

2.　　　　Defendant Condominium Group is a District of Columbia limited liability company that acted as the developer and "declarant" with respect to The Chelsea. Defendants Callihan and Casey are the owners and managers of defendant Condominium Group.

3. Defendant National Title Services is a Maryland corporation, and is a provider of settlement services, including title insurance. Upon information and belief, defendant Callihan is an owner and director of defendant National Title Services. Defendants Callihan, Casey, and Condominium Group have an affiliate relationship with National Title Services.

4. Plaintiff Owners Association is a condominium unit owners association under the District of Columbia Condominium Act, and represents the unit owners of The Chelsea. The Owners Association's members are the current unit owners. Pursuant to D.C. Code § 42-1903.08, the Owners Association has the power to institute this lawsuit, both on its own behalf and on behalf of its members.

5. Plaintiffs Nicole DeGraffenreed, Shikha Bhatnagar, and Joellynn Schulz are individual unit owners of The Chelsea, as well as members of the Owners Association.

6. Defendant Condominium Group purchased the property located at 1815 A Street, S.E. on or about August 3, 2004. The property contained a structure that at one time had been a rental housing accommodation, but that was vacant at the time it was purchased by defendant Condominium Group.

7. On or about December 29, 2004, defendant Condominium Group submitted to the District of Columbia Department of Consumer and Regulatory Affairs (hereinafter "DCRA") an Application For Condominium Registration (the "Application"). The Application was completed in a format dictated by DCRA, which requires the applicant to respond to a series of questions and provide various types of supporting documentation.

8. The Application contained a number of false and/or misleading representations, and at least one of the documents submitted by defendants with the Application was an intentional forgery.

9. One of the questions in the Application was: "What form of security has been obtained to assure compliance with § 45-1856 of the [Condominium] Act?"

10. Defendant Condominium Group responded by stating: "Declarant will file a Letter of Credit with the District of Columbia. A copy of the Letter of Intent to Issue the Letter of Credit is attached hereto as Exhibit I-2." Then, attached as Exhibit I-2 to the Application, defendants submitted what purported to be a letter from Bank of America, signed by "Walter P. Stolze, Branch Manager." The purported letter was addressed to DCRA, and stated: "The institution will consider issuing a Letter of Credit on behalf of the above referenced project in an amount not to exceed $18,500 to secure the warranty against structural defects under the D.C. Condominium Act, D.C. Code Section 42-1903.16. The issuance of the Letter of Credit would be subject to formal application and our Norman [sic] credit and documentation requirements, which we currently believe can be fulfilled."

11. This purported letter from Bank of America purportedly signed by "Walter P. Stolze, Branch Manager" was a forgery.

12. At the time that the Application was submitted, owners and/or agents of defendant Condominium Group knew that the purported letter from Bank of America purportedly signed by "Walter P. Stolze, Branch Manager" was a forgery.

13. At the time that the Application was submitted, defendant Callihan knew that the purported letter from Bank of America purportedly signed by "Walter P. Stolze, Branch Manager" was a forgery.

14. At the time that the Application was submitted, defendant Casey knew that the purported letter from Bank of America purportedly signed by "Walter P. Stolze, Branch Manager" was a forgery.

15. On or about January 25, 2005, DCRA issued a letter granting Registration No. 1945, which gave defendant Condominium Group authority to proceed with the marketing and sale of condominium units at The Chelsea. Upon information and belief, DCRA would not have granted that registration if DCRA had known that the purported letter from Bank of America purportedly signed by "Walter P. Stolze, Branch Manager" was a forgery.

16. After they obtained registration, defendants then began to market and sell condominium units at The Chelsea. In connection with those efforts, defendants distributed to potential purchasers a Public Offering Statement ("POS").

17. The POS contained a number of false and/or misleading representations and/or omissions.

18. The POS contained the following representation: "The development of the Condominium is, to the best of Declarant's knowledge, in compliance with all applicable zoning ordinances, housing codes, building codes and similar laws affecting the Condominium" This representation was false and/or misleading, and, upon information and belief, was known to defendants Condominium Group, Callihan and Casey to be false and/or misleading.

19. The POS contained the following representation: "The Declarant presently expects to complete the renovation program by November 14, 2004." This representation was false and/or misleading, and, upon information and belief, was known to defendants Condominium Group, Callihan and Casey to be false and/or misleading.

20. The POS represented that the cost of renovation was $185,000 and that "funds to complete the renovation work are being provided to the Declarant by DBT Development."

This representation was false and/or misleading, and, upon information and belief, was known to defendants Condominium Group, Callihan and Casey to be false and/or misleading.

21. The POS contained a description of the Bylaws of the condominium association, and represented that "the Bylaws and the Condominium Act require that: (i) at the time units to which 25% of the percentage interests in the Condominium have been conveyed, the Association shall hold a special meeting at which not less than 25% of the members of the board of directors shall be elected by unit owners other than the Declarant; and (ii) at the time units to which 50% of the percentage interests in the Condominium have been conveyed, the Association shall hold a special meeting at which not less than 33-1/3% of the members of the board of directors shall be elected by unit owners other than the Declarant." The defendants, however, did not intend to comply with those requirements of the Bylaws and the Condominium Act (and, in fact, ultimately failed to do so). Accordingly, this representation was false and/or misleading and, upon information and belief, was known to defendants Condominium Group, Callihan and Casey to be false and/or misleading.

22. The POS contained estimates of the budget for the first 12 months of the condominium's operation, which included "a provision for a general replacement reserve based on evaluation of the useful lives and replacement costs of certain common elements, which the Declarant (after consultation with the project Architect) believes will require replacement on a periodic basis." The estimates of the budget for the first 12 months, and of the replacement reserves, contained in the POS were gross underestimates. Upon information and belief, defendants Condominium Group, Callihan and Casey knew that those estimates were false and/or misleading at the time they were made. Upon information and belief, defendants Condominium Group, Callihan and Casey intentionally or recklessly underestimated those

5

amounts in order to mislead potential purchasers concerning the amount of condominium fees and assessments that such potential purchaser would be required to pay.

23. As of the filing of this complaint, 12 of the 15 units in the condominium have been sold. The closings on those 12 units occurred between February 2, 2005 and April 29, 2005.

24. Prior to the closings, defendants failed to disclose (in the POS or otherwise) to potential purchases a number of material facts.

25. Prior to the closings, defendants failed to disclose that a forged document had been submitted to DCRA in connection with the Application.

26. Prior to the closings, defendants failed to disclose that the warranty bond required by the Condominium Act had not been posted.

27. Prior to the closings, defendants failed to disclose that they had not received permits for the work done by their contractors at the condominium, and had not received a Certificate of Occupancy from DCRA.

28. Prior to the closings, defendants failed to disclose that the condominium was in violation of housing codes, building codes and/or fire safety codes of the District of Columbia.

29. Prior to the closings, defendants failed to disclose their true intent, which was to attempt to sell and close on all 15 of the units without actually finishing the renovation of the condominium and/or bringing the condominium into compliance with housing codes, building codes and/or fire safety codes of the District of Columbia.

30. As a result of the intentional, reckless and/or negligent actions and omissions of the defendants, the condominium currently suffers from serious design and/or construction defects.

31. The defects currently known to plaintiff were outlined in an Architectural & Engineering Report that was delivered to the defendants on or about November 30, 2005.

32. Since November 30, 2005, defendants have not corrected those defects, and have not communicated any plan or intention to correct those defects or otherwise make plaintiff Owners Association, or its members, whole for the costs of correcting those defects.

33. Upon information and belief, the condominium may suffer from additional serious design and/or construction defects that are not specifically outlined in that Architectural & Engineering Report because either those defects cannot be detected without destructive testing (which has not yet been conducted) or those defects have not yet manifested themselves in a way that was detected.

34. Defendants Callihan, Casey, and Condominium Group, and/or their agents, required or influenced the Unit Owner Plaintiffs to use the settlement services (including the provision of title insurance) of defendant National Title Services. Prior to the closings on their units, the Unit Owners Plaintiffs were informed by defendants and/or their agents that all closing on units at The Chelsea would be handled by National Title Services. Prior to the closings, defendants did not disclose to the Unit Owner Plaintiffs that National Title Services had an affiliated business arrangement with defendants Callihan, Casey, and Condominium Group, and that those defendants stood to benefit financially from unit owners' use of the services of National Title Services.

35. At the closings, defendant National Title Services charged each of the Unit Owner Plaintiffs $100 for "attorney's fees." The only attorney associated with National Title Services was defendant Callihan. During the time of the closings, Callihan was hospitalized and/or otherwise incapacitated by illness, and did not perform legal serices for National Title

7

Services. No other attorney performed any services relating to the closings. Accordingly, no basis existed for National Title Services to charge the Unit Owner Plaintiffs for "attorney's fees."

36. At the closings, defendant National Title Services charged each of the Unit Owner Plaintiffs $325 for an "abstract and title search." National Title Services did not, however, actually pay $325 for an "abstract and title search." Instead, National Title Services had a policy and practice of charging $325 for an "abstract and title search" at each closing that it handled, regardless of whether it had actually paid such amount to anyone to prepare an abstract or conduct a title search.

37. Defendants Callihan and Casey personally participated in the actions and omissions set forth in this Complaint.

38. Defendant Condominium Group is a mere alter ego of defendants Callihan and Casey. Defendant Condominium Group is effectively one and same with defendants Callihan and Casey. Defendants Callihan and Casey used defendant Condominium Group to perpetrate fraudulent and otherwise wrongful conduct as set forth in this Complaint. To hold Callihan and Casey liable for the debts of defendant Condominium Group would be both fair and just.

39. Defendant National Title Services is a mere alter ego of defendant Callihan. Defendant National Title Services is effectively one and same with defendant Callihan. Defendant Callihan used defendant National Title Services to perpetrate fraudulent and otherwise wrongful conduct as set forth in this Complaint. To hold Callihan liable for the debts of defendant National Title Services would be both fair and just.

## JURISDICTION

40. The Court has jurisdiction of this action pursuant to 12 U.S.C. §§ 2607, 2608 & 2614, and 28 U.S.C. §§ 1331 & 1367.

## COUNT ONE:  BREACH OF STATUTORY WARRANTY

41. Paragraphs 1 through 40 are incorporated herein by reference.

42. The units and common areas of the condominium contain structural defects, within the meaning of D.C. Code § 42-1903.16.

43. Defendants Condominium Group, Callihan and Casey have breached their obligations to remedy and repair those structural defects.

44. As a result, plaintiff Owners Association and its members have suffered and/or will suffer damages.

## COUNT TWO:  BREACH OF IMPLIED WARRANTIES

45. Paragraphs 1 through 44 are incorporated herein by reference.

46. Defendants Condominium Group, Callihan and Casey, by designing, constructing and selling units in a condominium that suffers from structural defects, breached the implied warranty of merchantability, the implied warranty of fitness, and the implied warranty of compliance with workmanlike standards.

47. Defendants Condominium Group, Callihan and Casey have breached their obligations to remedy and repair those structural defects.

48. As a result, plaintiff Owners Association and its members have suffered and/or will suffer damages.

## COUNT THREE:  STRICT LIABILITY

49. Paragraphs 1 through 48 are incorporated herein by reference.

50. The Chelsea condominium, and the individual units thereof, are products that were sold to plaintiff Owners Association and its members in a defective and unreasonably dangerous condition.

51. Defendants Condominium Group, Callihan, Casey and National Title Services were integral parts of the overall producing and marketing enterprise that placed these products into the stream of commerce.  Accordingly, each and all of them are accountable to plaintiff Owners Association and its members for damages caused by the defective products.

52. As a result of defendants Condominium Group, Callihan, Casey and National Title Services producing and marketing of the defective products, plaintiff Owners Association and its members have suffered and/or will suffer damages.

## COUNT FOUR:  NEGLIGENCE

53. Paragraphs 1 through 52 are incorporated herein by reference.

54. Defendants Condominium Group, Callihan and Casey acted negligently and recklessly in designing, supervising and/or conducting the construction and/or renovation of The Chelsea condominium.

55. As a result of defendants Condominium Group's, Callihan's and Casey's negligent and reckless conduct, plaintiff Owners Association and its members have suffered and/or will suffer damages.

## COUNT FIVE:  REAL ESTATE SETTLEMENT PROCEDURES ACT – AFFILIATED BUSINESS ARRANGEMENTS (12 U.S.C. § 2607)

56. Paragraphs 1 though 53 are incorporated herein by reference.

10

57. Defendants are "affiliated business arrangements" within the meaning of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*

58. Defendants Callihan, Casey and Condominium Group were and are in a position to refer business to National Title Services as part of a real estate settlement service involving a federally related mortgage loan

59. Defendants Callihan, Casey and Condominium Group did refer the Unit Owner Plaintiffs to National Title Services and affirmatively influence the selection of National Title Services by the Unit Owner Plaintiffs. *See* 12 U.S.C. § 2602(7).

60. Defendants Callihan, Casey and Condominium Group received a "thing of value" by referring unit owners to National Title Services for business incident to or a part of a real estate settlement service involving a federally related mortgage loan.

61. Defendants did not satisfy the statutory and regulatory requirements that may exempt affiliated business arrangements from violating 12 U.S.C. § 2607 due to beneficial ownership. In particular, and among other things, defendants: did not disclose to unit owners, including the Unit Owner Plaintiffs, the existence of an affiliated business arrangement involving National Title Services; did not provide to unit owners, including the Unit Owner Plaintiffs, a written estimate of the charge or range of charges generally made by National Title Services; required unit owners, including the Unit Owner Plaintiffs, to use the settlement services of National Title Services; and did not merely receive a return on their ownership interest from National Title Services as a result of the arrangement.

62. The Unit Owner Plaintiffs were charged for settlement services by National Title Services in connection with their purchase of real estate from defendants.

63. Defendants violated RESPA's prohibition against kickbacks and unearned fees by failing to disclose the affiliated business arrangement described above, and by failing to take the other steps required by law to prevent such liability. Defendants acted intentionally and not as a result of a bona fide error, and defendants did not maintain procedures that are reasonably adapted to avoid any such errors.

64. Accordingly, defendants are jointly and severally liable to the Unit Owner Plaintiffs for violating 12 U.S.C. § 2607.

65. Unit Owner Plaintiffs are entitled to court costs, expenses and attorneys' fees for defendants' violation of 12 U.S.C. § 2607.

### COUNT SIX:  REAL ESTATE SETTLEMENT PROCEDURES ACT – TITLE INSURANCE (12 U.S.C. § 2608)

66. Paragraphs 1 through 65 are incorporated herein by reference.

67. Defendants Callihan and Casey, and their alter ego defendant Condominium Group sold property to the Unit Owner Plaintiffs in connection with the assistance of a federally related mortgage loan.

68. Defendants Callihan and Casey, and their alter ego defendant Condominium Group, required the Unit Owner Plaintiffs, directly or indirectly, as a condition of sale, to purchase title insurance covering the property from a particular title company, namely defendant National Title Services.

69. By requiring the Unit Owner Plaintiffs to purchase title insurance from National Title Services, defendants National Title Services, Callihan, Casey and Condominium Group violated 12 U.S.C. § 2608.

## COUNT SEVEN:  FRAUD

70. Paragraphs 1 through 69 are incorporated herein by reference.

71. As detailed above and below in the allegations contained in Count Nine, the defendants made numerous material misrepresentations to the members of the Owners Association, including the Unit Owner Plaintiffs, and also omitted to inform the members of the Owners Association, including the Unit Owner Plaintiffs, of various material facts.

72. As a result of those material misrepresentations and omissions – upon which the members of the Owners Association, including the Unit Owner Plaintiffs, reasonably relied – the members of the Owners Association, including the Unit Owner Plaintiffs, agreed to purchase, and subsequently did purchase, individual units at The Chelsea condominium, and agreed to use defendant National Title Services to handle the settlements and provide title insurance, and agreed to pay certain amounts charged by National Title Services in connection with the settlements.

73. As a proximate result of their reasonable reliance upon defendants' fraudulent misrepresentations and omissions, the members of the Owners Association, including the Unit Owner Plaintiffs, have suffered and/or will suffer damages.

74. Defendants committed fraud with malice, ill will, recklessness, wantonness, oppressiveness and willful disregard for the rights of the members of the Owners Association, including the Unit Owner Plaintiffs.

## COUNT EIGHT:  D.C. CONSUMER PROTECTION PROCEDURES ACT

75. Paragraphs 1 through 74 are incorporated herein by reference.

76. The defendants marketed and sold condominium units at The Chelsea condominium, and marketed and sold settlement services in connection with the sale of those condominium units. In connection with the marketing and sale of those units, defendants made misrepresentations and material omissions that had a tendency to mislead, as detailed above, and as detailed below in the allegations contained in Count Nine.

77. Defendants were and are "merchants" within the meaning of the D.C. Consumer Protection procedures Act (the "CPPA").

78. Plaintiff Owners Association is a "person" and its members are "consumers" within the meaning of the CPPA.

79. The Unit Owner Plaintiffs are "persons" and "consumers" within the meaning of the CPPA.

80. The sale of residential real estate, and the sale of settlement-related services, are the provision of "goods and services" within the meaning of the CPPA.

81. The making of representations and otherwise marketing to potential purchasers of condominium units and/or settlement services are "trade practices" within the meaning of the CPPA.

82. By making misrepresentations, and by failing to disclose material information, to the members of the Owners Association, to the Individual Unit Owners, and to other potential purchasers, defendants engaged in unlawful trade practices within the meaning of the CPPA.

83. Plaintiff Owners Association, acting for its own interests, for the interests of its members, and for the interests of the general public, is entitled, pursuant to D.C. Code § 28-3905(k), to bring this action seeking relief from defendants' unlawful trade practices.

84.     The Unit Owner Plaintiffs, acting for their own interests, and for the interests of the general public, are entitled, pursuant to D.C. Code § 28-3905(k), to bring this action seeking relief from defendants' unlawful trade practices.

### COUNT NINE:  REAL ESTATE SETTLEMENT PROCEDURES ACT – CHARGES OTHER THAN FOR SERVICES PERFORMED (12 U.S.C. § 2607)

85.     Paragraphs 1 though 84 are incorporated herein by reference.

86.     Under RESPA, the provider of settlement services is prohibited from charging fees to a borrower "other than for services performed".  *See* 12 U.S.C. §2607.

87.     Defendant National Title Services charged for "attorney's fees" when no attorney provided any services.

88.     By so doing, defendant National Title Services violated RESPA.

89.     Defendant National Title Services charged an amount for "abstract or title search" even when the amount charged by National Title Services was less than the amount actually paid by National Title Services for an abstract and/or title search.

90.     By so doing, defendant National Title Services violated RESPA.

91.     Unit Owner Plaintiffs are entitled to court costs, expenses and attorneys' fees for defendants' violation of 12 U.S.C. § 2607.

WHEREFORE, plaintiffs pray for the following relief:

a.     Damages, in an amount to be proved at trial;

b.     Punitive damages, in an amount to be proved at trial;

c.     The remedies provided by the CPPA, including treble damages, or $1,500 per violation, whichever is greater; punitive damages; and, an injunction against the use by defendants of unlawful trade practices;

     d.     The remedies provided by RESPA, including, but not limited to, three times the charges made for settlement services and for title insurance;

     e.     Reasonable attorneys' fees, costs and expenses;

     f.     Pre-judgment and post-judgment interest, as permitted by law; and

     g.     Such further and additional relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all issues triable to a jury.

Respectfully submitted,

\_\_\_\_\_/s/_____
Jonathan K. Tycko
 D.C. Bar No. 445851
TYCKO & ZAVAREEI LLP
2000 L Street, N.W., Suite 808
Washington, D.C. 20036
(202) 973-0900
(202) 973-0950 (fax)
jtycko@tzlegal.com

*For Plaintiffs, The Chelsea Condominium Unit Owners Association, Nicole DeGraffenreed, Shikha Bhatnagar and Joellynn Schulz*